# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

UNITED STATES OF AMERICA *ex rel.*
SHAUNA HLYWIAK,

        Plaintiff,

    v.

GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC., *et al.*,

        Defendants.

No. 1:20-cv-13590

**OPINION**

---

## APPEARANCES:

Noah Axler
ANDERSON KILL, P.C.
1760 Market St., Suite 600
Philadelphia, PA 19103

David M. Cedar
WILLIAMS CEDAR, LLC
8 Kings Highway West, Suite B
Haddonfield, NJ 08033

Gerald J. Williams
WILLIAMS CEDAR, LLC
One South Broad St., Suite 1510
Philadelphia, PA 19107

    *On behalf of Plaintiff/Relator Shauna Hlywiak.*

Jonathan Spells Krause
Corinne Samler Brennan
KLEHR HARRISON HARVEY BRANZBURG, LLP
1000 Lincoln Drive East, Suite 201
Marlton, NJ 08053

    *On behalf of Defendants Great Lakes Educational Loan Services, Inc., Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC; and Nelnet, Inc.*

David G. Murphy
Diane A. Bettino
REED SMITH LLP
506 Carnegie Center, Suite 300
Princeton, NJ 08540

    *On behalf of Defendants Navient Corporation and Navient Solutions LLC.*

Stephen M. Orlofsky
Nicholas C. Harbist
BLANK ROME LLP
300 Carnegie Center, Suite 220
Princeton, NJ 08540

Blair A. Gerold
BLANK ROME LLP
1 Logan Square
Philadelphia, PA 19103

    *On behalf of Defendant Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing.*

David Edward Dauenheimer
U.S. DEPARTMENT OF JUSTICE
   OFFICE OF THE U.S. ATTORNEY
970 Broad St.
Newark, NJ 07102

    *On behalf of Interested Party United States.*


**O'HEARN, District Judge.**

## INTRODUCTION

Plaintiff/Relator Shauna Hlywiak ("Relator") brings this *qui tam* action against Defendants Great Lakes Educational Loan Services, Inc. ("Great Lakes"), Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc. (collectively, "Nelnet"), Navient Corporation and Navient Solutions LLC (collectively, "Navient"), and Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing ("PHEAA," and together with Great Lakes, Nelnet, and

Navient, the "Defendants"),[1] alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). (Am. Compl., ECF No. 5, ¶ 1). In her Amended Complaint (ECF No. 5), Relator alleges that Defendants, which service federal student loans, are liable under the FCA for violating federal and state laws in breach of their servicing contracts ("Servicing Contracts") with the U.S. Department of Education ("DOE") by failing to apply student loan borrowers' payments to those borrowers' loans with the highest interest rate since the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")[2] was passed in March 2020. (Am. Compl., ECF No. 5, ¶¶ 5–9). Now, this matter comes before the Court upon PHEAA's Motion to Dismiss the Amended Complaint, (ECF No. 71), which Navient, Great Lakes, and Nelnet join (ECF No. 72; ECF No. 73). For the reasons that follow, the Court **GRANTS** Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72; ECF No. 73) and **DISMISSES** the Amended Complaint (ECF No. 5).

---

[1] "FedLoan Servicing" was originally named as a Defendant in the Amended Complaint (ECF No. 5), but per Relator and PHEAA's Stipulation of Dismissal (ECF No. 35), Relator withdrew all claims against "FedLoan Servicing" which was added as a "d/b/a" name of PHEAA, and the case caption was revised accordingly.

[2] CARES Act, Pub. L. No. 116-136, §§ 3513(a)–(b), 134 Stat. 281, 404.

I.    **BACKGROUND**

   **A. Procedural History**

Relator instituted this *qui tam* action on September 30, 2020. (ECF No. 1). After an investigation into Relator's claims, the United States filed a Notice of Election to Decline Intervention on January 5, 2021. (ECF No. 3). Relator filed an Amended Complaint against the Defendants on January 7, 2021. (ECF No. 5).[3]

In their Joint Motion to Dismiss, Defendants argue that the Amended Complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) because Relator fails to state a claim under the FCA as she fails to plausibly allege (i) that Defendants submitted false claims; (ii) that any alleged misrepresentations—which there were none—were material to DOE's decision to pay Defendants; (iii) that Defendants acted with the requisite scienter under the FCA; and (iv) that Defendants acted with the requisite particularity required by Rule 9(b). (ECF No. 71 at 1–4).

Having considered the parties' arguments, the Court agrees with Defendants that Relator fails to state a claim and concludes that the Amended Complaint must be dismissed.

---

[3]   Shortly after Relator filed her Amended Complaint, several other federal student loan borrowers represented by the same counsel as Relator filed three putative class action complaints against the same Defendants, (Case No. 21-01047; Case No. 21-01052; Case No. 21-09096), asserting common law and state law claims based on substantially the same facts. This Opinion contains similar background as its recent Opinion in the putative class action cases, given the overlapping allegations across the four cases.

### B.  Factual Background[4]

#### 1.  Administration of the Federal Student Loan Program

Under the Higher Education Act ("HEA"), DOE has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1071–1099c. In the 1990s, the federal government began originating loans under the William D. Ford Direct Loan Program, *see* 20 U.S.C. §§ 1087a–1087j, and in 2008, began purchasing student loans from non-federal entities through the Federal Family Education Loan Program, (ECF No. 5, ¶ 29). The Federal Student Aid ("FSA") office, a part of DOE, is responsible for managing these federal loan programs authorized under the HEA. (ECF No. 5, ¶ 29).

Congress directed DOE to enter into contracts for the "servicing" of these federal loans and "such other aspects of the direct student loan program as the Secretary determines are necessary." 20 U.S.C. § 1087f. In 2009, DOE awarded each Defendant a Servicing Contract with a five-year term, each of which has been extended numerous times. (ECF No. 5, ¶¶ 30, 32, 36). The Servicing Contracts require each Defendant to "'be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.'" (ECF No. 5,

---

[4]  Because the Joint Motion to Dismiss before the Court is under Rule 12(b)(6), the Court accepts the factual allegations in the Amended Complaint (ECF No. 5) as true and will view all facts in the light most favorable to Plaintiffs as the non-moving parties. *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). The Court may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). Relator attaches a "disclosure statement" to her Amended Complaint (ECF No. 5-1 at 80–83); however, the Court does not find that this is a "written instrument" to be considered part of the pleading under Rule 10(c), as "affidavits are not considered a 'written instrument'" and instead are considered "outside the pleading." *Barnard v. Lackawanna County*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016), *aff'd*, 696 F. App'x 59 (3d Cir. 2017); Fed. R. Civ. P. 10(c).

¶¶ 33, 44, 56).[5] DOE pays each Defendant a dynamic monthly servicing fee calculated based on a number of factors including the number of borrower accounts serviced by each Defendant and the repayment status of each borrower account. (ECF No. 5, ¶¶ 48–51; Ex. A, § B.13). The Servicing Contracts guarantee a minimum annual revenue for each Defendant "provided that [they are] in compliance with the requirements for servicing federally held debt." (ECF No. 5, ¶ 31; Ex. A, § B.13). The Servicing Contracts also state:

> Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer[s] (i.e. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

(ECF No. 5, ¶ 46; Ex. A, § B.13).

Relator alleges that Defendants were not servicing loans in compliance with the Servicing Contracts because they violated federal and state law after the CARES Act was passed in March 2020.

### 2. The CARES Act Places Federal Student Loans in Administrative Forbearance

In March 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which granted temporary relief to federal student loan borrowers by placing their loans in administrative forbearance[6] until September 30, 2020, meaning that all payments due for certain

---

[5] Relator alleges that the Servicing Contracts with all Defendants are "replicas" and attaches only the Servicing Contract with Great Lakes (ECF No. 5, ¶ 30 n.2), which Defendants do not contest.

[6] 34 C.F.R. § 685.205(a) (2020) ("'Forbearance' means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled."); 34 C.F.R. § 685.205(b) (2020) ("Administrative forbearance. In Certain circumstances, the Secretary grants forbearance without requiring documentation from the borrower . . . due to a . . . local or national emergency.").

student loans held by DOE were suspended, interest on these loans would not accrue after March 13, 2020, and the interest rates on the loans were temporarily reduced to 0% (the "CARES Act Forbearance Period"). Before the CARES Act Forbearance Period expired on September 30, 2020, former President Trump directed the Secretary of Education ("Secretary") to extend the administrative forbearance until December 31, 2020, by Presidential Memorandum.[7] Since that first extension, the CARES Act Forbearance Period has been extended several times—most recently until May 1, 2022.[8]

Because federal student loan borrowers are not required to make loan payments during the CARES Act Forbearance Period, these payments are considered "prepayments" under federal regulation, and are to be applied to repay a borrowers' federal student loans in the following manner: "first to any accrued charges and collection costs, then to any outstanding interest, and then to outstanding principal." 34 C.F.R. §§ 685.211(a)(1)–(2) (2014). Although this provision is clear about how a prepayment should be allocated on amounts due under a single federal loan, the regulation does not specify how a single prepayment should be allocated across student loans when a borrower has more than one loan.

---

[7] Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000590/pdf/DCPD-202000590.pdf.

[8] Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022. Although the newest extension of the CARES Act Forbearance Period had not been issued prior to the Amended Complaint being filed or the Joint Motion to Dismiss being fully briefed, the Court may take judicial notice of such fact. Fed. R. Evid. 201(b); *see also In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 390 n.34 (D.N.J. 2010).

### 3.   Relator's Prepayments and Allegations against Defendants

Relator Shauna Hlywiak, whose federal student loans are serviced by Great Lakes, made prepayments between March and August 2020 during the CARES Act Forbearance Period, (ECF No. 5, ¶¶ 112–22). Relator alleges that Great Lakes wrongfully applied her prepayments proportionally across her various loans, instead of allocating her prepayments to the loans with the highest interest rate. (ECF No. 5, ¶¶ 123–26). Relator argues that this proportional allocation method violates federal and state law because Great Lakes was required to allocate each prepayment to her loans with the highest interest rate, and that Great Lakes' website stated that it would apply prepayments to a borrower's highest interest rate loans. (ECF No. 5, ¶¶ 123–26).

An example of Defendants' proportional allocation method is instructive. Relator made a $1,300 prepayment toward her federal student loans during the CARES Act Forbearance Period on May 15, 2020. (ECF No. 5, ¶ 115). At the time of her prepayment, she had no outstanding interest that had accrued prior to March 13, 2020, and her $1,300 prepayment was allocated proportionally among the principals of her federal student loans as follows:

| Loan Number | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Prior to the COVID Forbearance Period |
|---|---|---|---|---|
| 519 | $0.00 | $0.00 | $3,247.42 | 5.600% |
| 520 | $36.40 | $0.00 | $2,406.49 | 6.800% |
| 521 | $0.00 | $0.00 | $4,175.21 | 4.500% |
| 522 | $69.94 | $0.00 | $4,601.54 | 6.800% |
| 523 | $34.97 | $0.00 | $2,300.72 | 6.800% |
| 524 | $0.00 | $0.00 | $5,103.01 | 3.400% |
| 525 | $32.37 | $0.00 | $2,135.00 | 6.800% |
| 526 | $0.00 | $0.00 | $5,190.38 | 3.400% |
| 527 | $5.33 | $0.00 | $348.33 | 6.800% |
| 528 | $172.64 | $0.00 | $11,369.12 | 5.410% |
| 529 | $233.60 | $0.00 | $14,723.05 | 6.210% |
| 530 | $111.41 | $0.00 | $7,332.11 | 5.410% |
| 531 | $315.90 | $0.00 | $20,796.26 | 5.840% |
| 533 | $297.44 | $0.00 | $19,548.79 | 5.310% |

(ECF No. 5, ¶ 116). She asserts that Great Lakes violated federal and state law when it proportionally allocated her prepayment, as Great Lakes should have allocated her $1,300 prepayment only to her loans that had been assigned a 6.800% interest rate—the highest interest rate—prior to the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 123–125). Relator alleges that she "brought the misallocation to the attention of Great Lakes" via e-mail, and Great Lakes responded explaining that the interest rates for Relator's loans are not "taken into consideration" because all the interest rates of her loans had been lowered to 0% during the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 126–27). Therefore, the prepayments were prorated across her loans "based on the outstanding principal balance only."[9] (ECF No. 5, ¶ 127).

Relator alleges that after this "exchange" with Great Lakes, she contacted other individuals whom Relator knew were also continuing to pay their federal student loans during the CARES Act Forbearance Period, and that these individuals, whose loans were serviced by Great Lakes, Nelnet, Navient, and PHEAA, sent her "screenshots" showing that these Defendants were proportionally allocating these individuals' prepayments as well. (ECF No. 5, ¶ 128).

---

[9]  The Amended Complaint alleges that Great Lakes prorated Relator's prepayments across her unsubsidized loans only, and not her subsidized loans (Loan Nos. 519, 521, 524, and 526) (ECF No. 5, ¶ 127), but any material distinction between subsidized and unsubsidized loans is not explained in the Amended Complaint or raised by the parties in their Briefs related to this Motion. Therefore, the Court does not view any such distinction as material to its analysis of the Motion.

### 4.   Defendants' Website Representations

Relator alleges that Great Lakes' website indicates that Great Lakes' default payment allocation method for prepayments is that the portion of the prepayment that is applied to principal will be applied to the principal of a borrower's highest-interest-rate loan, including those that are in forbearance. (ECF No. 5, ¶¶ 94–95). Nelnet's website allegedly makes a similar representation that any prepayment will be allocated across a borrower's loans "starting with the highest interest rate," including those loans that are "not in repayment status," which Relator interprets to mean those loans in forbearance. (ECF No. 5, ¶¶ 96–97). Relator further alleges that Navient's website indicates the same default allocation method:  where a borrower does not "provide special payment instructions," a prepayment will be allocated to a borrower's loan with the highest interest rate. (ECF No. 5, ¶ 98). Relator's allegations regarding PHEAA's website do not discuss PHEAA's payment allocation method, and instead allege that its website states that a prepayment could assist a borrower to "pay less interest over the life" of the borrower's loan by making prepayments. (ECF No. 5, ¶ 101).[10]

### 5.   Alleged Violations of Federal and State Law

In asserting that Defendants violated federal law, Relator relies on former President Obama's Presidential Memorandum ("Presidential Memorandum") issued in March 2015, which stated its intent to create a "Student Aid Bill of Rights," and directed that "[a]s soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans

---

[10]   The Amended Complaint alleges that Defendants' websites defined other terms such as "excess payment" and "overpayment" to mean the portion of a payment received above the amount that was currently due. (ECF No. 5, ¶¶ 93, 99). For clarity's sake, the Court uses the codified term "prepayment," in this Opinion, as it finds all these terms to be substantially similar when referring to the amounts that Relator paid during the CARES Act Forbearance Period. *See* 34 C.F.R. § 685.211(a)(2) (2014) ("If a borrower pays any amount in excess of the amount due, the excess amount is a prepayment.").

with the highest interest rate . . . unless otherwise instructed by borrowers."[11]   Relator further

asserts that Defendants violated the Consumer Financial Protection Act ("CFPA"), "which

prohibits 'unfair, deceptive, or abusive acts or practices' in connection with any transaction with

a consumer for a consumer financial product or service, or the offering of a consumer financial

product or service," (ECF No. 5, ¶ 110 (citing 12 U.S.C. § 5531)), and briefly refers to a case

where the Consumer Financial Protection Bureau ("CFPB") sued Navient under the CFPA "for

making misrepresentations to borrowers and misallocating payments, in context other than those

set forth in this Amended Complaint," (ECF No. 5, ¶ 110).

Relator alleges that Defendants also violated the following state laws: (1) New Jersey's

Student Borrower Bill of Rights (N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*); (2) California's Student

Borrower Bill of Rights (CAL. CIV. CODE § 1788.100 *et seq.*); (3) Colorado's Student Loan

Servicers Act (COL. REV. STAT. ANN. § 5-20-101 *et seq.*); (4) North Carolina's Student Borrowers'

Bill of Rights (H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019)); (5) Rhode Island's Student Loan

Bill of Rights (19 R.I. GEN. LAWS ANN. § 19-33-1 *et seq.*); and (6) Virginia's law regulating

---

[11] Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment, 80 Fed Reg. 13473, 13476 [hereinafter STUDENT AID BILL OF RIGHTS] (Mar. 13, 2015). Relator further asserts that although the Presidential Memorandum directed the Secretary to implement this change "as soon as practicable," the Secretary was to take action "no later than January 1, 2016." (ECF No. 5, ¶¶ 54–55). However, the Court takes judicial notice of the full text of the Memorandum, *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d at 390 n.34, and does not accept this statement as true because the Memorandum clearly instructed the Secretary to implement the change "[a]s soon as practicable," not by January 1, 2016. *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) ("[T]he Court need not accept Plaintiffs' allegations as true to the extent that they directly contradict the unambiguous text of [authentic documents or matters of public record]."). Rather, separate directives to the Secretary were to be completed "[b]y January 1, 2016." *Compare* STUDENT AID BILL OF RIGHTS at 13476 ("*By January 1, 2016*, the Secretary of Education shall require all Federal Direct student loan servicers to provide enhanced disclosures to borrowers and strengthened consumer protections." (emphasis added)) *with id.* ("*As soon as practicable*, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." (emphasis added)).

education loan servicers, (2020 Va. Legis. Serv. ch. 1198 (West) (codified at Vᴀ. Cᴏᴅᴇ Aɴɴ. § 6.2-2611(4))). (ECF No. 5, ¶¶ 58–63).

### 6.   Violation of the False Claims Act (Count I)

In a single Count in the Amended Complaint, Relator alleges that Defendants knowingly violated the Presidential Memorandum, the CFPA, and numerous state laws, and therefore, when Defendants knowingly failed to disclose to the Government that they had committed these violations when seeking to be paid for their services under the Servicing Contracts, Defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval" and "knowingly made, used, or caused to be made or used a false record or statements material to false or fraudulent claims." (ECF No. 5, ¶ 131–32).

Relator alleges that the Government paid for these claims which would not otherwise have been allowed to be paid under the Servicing Contracts, and that the Government relied on the accuracy of Defendants' "claims, statements, and records," unaware of their false and fraudulent nature. (ECF No. 5, ¶ 133). Relator asserts that "Defendants acted with the requisite scienter" and that compliance with these laws and contractual provisions were a "precondition of payment by the United States Government." (ECF No. 5, ¶ 134). Relator alleges that due to Defendants' proportional payment allocation method, borrowers' student loans will remain in repayment longer with Defendants receiving additional fees for an extended period of time, resulting in the Government paying more in servicing fees over the life of the loans. (ECF No. 5, ¶ 136).

According to Relator, the Servicing Contracts permit the Government to order the return of all the servicing fees that were billed and paid "from the time of noncompliance with any applicable federal requirement." (ECF No. 5, ¶ 135). Consequently, every billing made to the

Government for servicing the accounts of borrowers that made prepayments during the CARES

Act Forbearance Period is an independent false claim under the FCA. (ECF No. 5, ¶ 135).

## II.   <u>LEGAL STANDARD</u>

### A.  **Motion to Dismiss**

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

"[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a

motion to dismiss. *Id.* at 678. "[A] plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v.*

*Allain*, 478 U.S. 265, 286 (1986)).

When reviewing a plaintiff's complaint on a motion to dismiss under Rule 12(b)(6), the

district court "must accept as true all well-pled factual allegations as well as all reasonable

inferences that can be drawn from them, and construe those allegations in the light most favorable

to the plaintiff." *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). When undertaking this

review, courts are limited to the allegations found in the complaint, exhibits attached to the

complaint, matters of public record, and undisputedly authentic documents that form the basis of

the claim. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997);

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### B.  The False Claims Act

Under the FCA, it is unlawful to knowingly submit a fraudulent claim to the federal government. *In re Plavix Mktg., Sales Prac. & Prod. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 938 (D.N.J. 2017) (citing *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d. Cir 2014)). The FCA includes a *qui tam* provision permitting private parties, known as relators, to bring suit on behalf of the United States against anyone who has submitted a false claim to the government. *Id.* at 938–39 (citing *Schumann*, 769 F.3d at 840). A violation of the FCA has four elements: (1) falsity, (2) causation, (3) knowledge, and (4) materiality. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d. Cir. 2017).

There are two primary categories of false claims that can satisfy the falsity requirement: (1) factually false claims and (2) legally false claims. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Wilkins v. United Health Grp. Inc.*, 659 F.3d 295, 305 (3d. Cir 2011).

Legally false claims are subcategorized into two theories of liability: (1) express false certification and (2) implied false certification. *United States v. Kindred Healthcare Inc.*, 469 F. Supp. 3d 431, 444–45 (E.D. Pa. 2020). A defendant is liable under the express false certification theory when they falsely certify that they have complied with a material statute, regulation, or contractual provision. *In re Plavix Mktg.*, 332 F. Supp. 3d 939. "By contrast, implied false certification liability attaches when a claimant 'makes specific representations about the goods or services provided' and the claimant's 'failure to disclose noncompliance with material statutory,

14

regulatory, or contractual requirements makes those representations misleading half-truths.'" *United States v. Eastwick Coll.*, 657 F. App'x 89, 93–94 (3d Cir. 2016) (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 191 (2016)).

Because FCA claims allege fraud, they are subject to the heightened pleading standards of Rule 9(b). *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d. Cir. 2014). For a relator to satisfy the standards of Rule 9(b) for purposes of FCA claims, the relator "must provide 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' Describing a mere opportunity for fraud will not suffice. Sufficient facts to establish 'a plausible ground for relief' must be alleged." *Id.* at 157–58 (citing *Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) and *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)).

## III.  DISCUSSION

Because Relator asserts that the Defendants violated the FCA by failing to disclose noncompliance with "material statutory, regulatory, or contractual requirements" when making "specific representations about the goods or services provided," Relator's claims are based on an implied false certification liability theory. *Eastwick Coll.*, 657 F. App'x at 93–94. Among Defendants' arguments for dismissal are that Relator fails to allege (a) that Defendants submitted false claims, (b) that such alleged misrepresentations were material to the Government's payment decisions, and (c) that the Defendants acted with the requisite scienter. The Court agrees and therefore grants their Joint Motion to Dismiss.

### A.  Falsity

Relator bases her FCA claim on her allegation that Defendants failed to disclose that they violated the Presidential Memorandum, the CFPA, New Jersey's Student Borrower Bill of Rights,

California's Student Borrower Bill of Rights, Colorado's Student Loan Servicers Act, North Carolina's Student Borrowers' Bill of Rights, Rhode Island's Student Loan Bill of Rights, and Virginia's law regulating education loan servicers.[12] "The falsity element 'asks whether [a] claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government.'" *United States ex rel. Freedman v. Bayada Home Health Care, Inc.*, No. 19-18753, 2021 WL 1904735, at *5 (D.N.J. May 12, 2021) (quoting *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020)). The Court will address each of these alleged violations.

### 1. Alleged Violation of the Presidential Memorandum

Defendants argue that the Presidential Memorandum places no direct obligation on servicers and was not law. Rather, the memorandum expressed the President's "policy preferences" and directed the Secretary to take further action; however, the Secretary never implemented the Presidential Memorandum's directive. (ECF No. 71 at 6–7, 16–18). Defendants are correct. The relevant portion of the Presidential Memorandum reads, "As soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." The Secretary, who has the authority to implement this change by promulgating regulations under 20 U.S.C. § 1082 (a)(1) of the HEA did not do so.

---

[12] Relator also alleges that Defendants violated the "Master Promissory Notes" (ECF No. 5, ¶¶ 131–32), but the Amended Complaint contains no information on what part or provision of the Master Promissory Notes that Defendants may have violated, nor does Relator's Response in Opposition mention the Master Promissory Notes. Therefore, the Court will not accept these conclusory allegations as true. *Iqbal*, 556 U.S. at 679 ("[P]leadings that . . . are no more than conclusions, are not entitled to the assumption of truth.").

In Relator's Response in Opposition, Relator repeatedly refers to the Presidential Memorandum as "federal law," (ECF No. 80 at 5), citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to argue that the President was acting through an "express or implied authorization of Congress" when issuing the Memorandum. (Case No. 21-09096, ECF No. 15 at 13–16).[13] However, Relator misses the mark. The Court need not determine whether former President Obama could issue the Presidential Memorandum—a fact no one disputes. Nor must the Court dive into the constitutional separation of powers because the HEA and the Presidential Memorandum do not conflict. Congress empowered the Secretary through the HEA to "prescribe such regulations as may be necessary . . . including regulations applicable to third party servicers." 20 U.S.C. § 1082(a)(1). The Presidential Memorandum instructed the Secretary to direct student loan servicers to allocate prepayments to a borrower's highest interest rate loan, through the Secretary's authority under the HEA, "[a]s soon as practicable." STUDENT AID BILL OF RIGHTS at 13476. The Secretary did not take the necessary action to transfer the President's policy objectives into law. This is unequivocally shown by two DOE publications, unenacted Congressional bills, and guidance issued by the FSA.

In July 2016, former Under Secretary of Education Ted Mitchell issued a memorandum ("Mitchell Memorandum") entitled "Policy Direction on Federal Student Loan Servicing" which "provide[d] policy direction for servicing of all federal student loans." U.S. DEP'T OF EDUC., POLICY DIRECTION ON FEDERAL STUDENT LOAN SERVICING [hereinafter MITCHELL

---

[13] Relator's legal analysis regarding the Presidential Memorandum was included in the Response in Opposition filed by the plaintiffs in the factually-related putative class actions discussed above, *see supra* note 3, and is only incorporated by reference in Relator's Brief in this case. (ECF No. 80 at 5). However, the Court's Scheduling Order clearly separated the briefing in the present case from the putative class actions, and Relator was to "file a single brief in opposition to all arguments raised" in Defendants' Joint Motion to Dismiss. (ECF No. 67 at 5). The Court nevertheless addresses the issue.

MEMORANDUM] (2016) at 1. One of DOE's "policy directions" was to instruct servicers to apply prepayments to "the [borrower's] loan bearing the highest interest rate." *Id.* at 25. The Mitchell Memorandum intended the "policy choices" to be applied "to the . . . extent feasible," and noted that some "aspects of this policy guidance" would need to be implemented through "future rulemakings," if "not currently allowable under [DOE's] regulations." *Id.* at 1 n.2. However, this "policy direction" was never implemented, and in April 2017, former Secretary Betsy DeVos formally withdrew the Mitchell Memorandum in a letter ("DeVos Letter") addressed to FSA. U.S. DEP'T OF EDUC., STUDENT LOAN SERVICER RECOMPETE [hereinafter DEVOS LETTER] (2017) ("As we move forward . . . I am withdrawing . . . the July 20, 2016 memorandum to you from former Under Secretary Ted Mitchell."). Congress also recognized that servicers were not required to allocate prepayments to a borrower's highest interest rate loan by introducing two bills in 2019 that would have amended the HEA to require servicers to do so; however, neither was passed. H.R. 5294, 116th Cong. § 2(g)(2) (2019); S. 1354, 116th Cong. § 3(a)(16)(G)(ii) (2019).

Then, in February 2021, the FSA issued guidance ("FSA Guidance") confirming that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan. Federal regulations instruct only that payments must first be allocated to outstanding interest and fees, and then to principal." U.S. DEP'T OF EDUC., G3.21.01, FSA SERVICER GUIDANCE, OVERPAYMENT PROCESS – CARES ACT [hereinafter FSA SERVICER GUIDANCE] at 1 (2021). Relator attempts to argue that the Court should ignore the FSA's "interpretation" of federal law (Case No. 21-09096, ECF No. 15 at 13), yet there are no regulations or statutes that cause the Court to question the statements in the FSA Guidance, nor have Plaintiffs

identified any such regulations or laws.[14] The FSA Guidance simply confirms that, at the time it was issued, the HEA and DOE's regulations did not require loan servicers to allocate borrowers' prepayments to their highest-interest-rate loans. Therefore, the Amended Complaint fails to allege any violation of the HEA or DOE regulations, as the Presidential Memorandum was never implemented into law by the Secretary.

### 2.  Alleged Violation of the CFPA

Relator next tries to ground Defendants' liability under the FCA in their alleged failure to disclose a supposed violation of the CFPA. Defendants argue that none of their website statements cited in the Amended Complaint reflects an "unfair, deceptive or abusive" act or practice as prohibited by the CFPA. (ECF No. 71 at 24–32). Defendants further note that they "are unaware of any court that has found a violation of the FCA based on a false certification of compliance with the CFPA." (ECF No. 71 at 25). The Court similarly has been unable to locate any case where a court has found a violation of the FCA based on non-compliance with the CFPA. Yet Relator's Response in Opposition wholly ignores each of Defendants' arguments regarding the CFPA and fails to mention the statute at all. Relator would have the Court find in her favor without providing a single case or argument while asking the Court to rule on a matter of first impression. Given Relator's apparent concession that the Amended Complaint fails to plausibly allege a violation of the CFPA, the Court declines to do so.

---

[14]  Even if the HEA or 34 C.F.R. § 685.211 were ambiguous as to Defendants' obligations regarding applying prepayments—which they are not—the Court must give "substantial deference" to the DOE's reasonable interpretation of the HEA, and the DOE's interpretation of its own regulations is "controlling." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015) (stating that "[t]he Secretary's reasonable interpretation of the [HEA] is entitled to substantial deference" and the DOE's interpretation of its own regulations is "controlling" unless it is "(1) plainly erroneous or inconsistent with the regulation, (2) does not reflect the agency's fair and considered judgment on the matter in question, or (3) represents a post hoc rationalization advanced by the agency seeking to defend past agency action against attack.").

### 3. Alleged Violations of State Law

Relator next alleges that Defendants submitted false claims by failing to disclose supposed violations of six state laws. However, upon cursory review, Relator's allegations quickly and easily fail.

First, the California and Virginia state laws on which Relator relies were not even in effect in 2020 when the alleged misconduct in the Amended Complaint occurred. *See* CAL. CIV. CODE § 1788.100 *et seq.* (effective Jan. 1, 2021); VA. CODE ANN. § 6.2-2600 *et seq.* (effective July 1, 2021). And North Carolina's "law" is not a law at all, but a bill that was introduced in North Carolina's legislature in April 2019, yet never enacted. *See* H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019).

Next, the remaining three laws that Defendants allegedly violated—Colorado's Student Loan Servicers Act, New Jersey's Student Borrower Bill of Rights, and Rhode Island's Student Loan Bill of Rights—do not require that student loan servicers apply prepayments to a borrower's highest-interest-rate loan. *See* COL. REV. STAT. ANN. § 5-20-101 *et seq.*; N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*; 19 R.I. GEN. LAWS ANN. §19-33-1 *et seq.* Instead, each contains a provision requiring that servicers "inquire of a student loan borrower" how to apply a prepayment to the borrower's student loans and to continue to implement the borrower's instructions on a go-forward basis. *See* COLO. REV. STAT. § 5-20-108(3)(a) (2019) ("[A] student loan servicer shall inquire of a borrower how to apply a[] [prepayment] to a student education loan. . . . A borrower's direction on how to apply a[] [prepayment] to a student education loan shall stay in effect for any future [prepayments]."); N.J. STAT. ANN. § 17:16ZZ-8(b) (2019) (similar); 19 R.I. GEN. LAWS § 19-33-8(g) (similar). The Amended Complaint includes no allegations that Defendants failed to request

borrowers provide instructions on how to apply their prepayments, or that Defendants failed to follow their instructions.

In her Response in Opposition, Relator attempts to assert new facts that Defendants failed to follow the borrower's explicit instructions which directed the Defendants to allocate prepayments to their highest-interest-rate loans, (ECF No. 80 at 5), but the Amended Complaint is devoid of these allegations. Relator also attempts to incorporate new allegations that Defendants violated the New Jersey Consumer Fraud Act as a basis for her FCA claim (ECF No. 80 at 5), but these allegations are also not included in the Amended Complaint and will not be considered by the Court. *W. Penn Power Co.*, 147 F.3d at 259; *see Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 301 n.1 (E.D.N.Y. 2014) ("To the extent Plaintiff has any factual allegations sufficient to state a claim . . . Plaintiff should include all of the necessary allegations in an amended complaint.").

The Amended Complaint fails to plausibly allege that Defendants violated any federal or state law or regulation to support the allegations that Defendants failed to disclose such supposed violations when submitting claims for payment. Accordingly, it must be dismissed.

## B.  Materiality

Even if Relator did plausibly allege that Defendants violated a federal or state statute or regulation and submitted false claims by failing to disclose the supposed violation, Relator fails to allege sufficient facts to show that any supposed violations were material to the Government's payment decision.

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 579 U.S. at 192. As set forth in *Escobar*, a misrepresentation is not

21

material solely because compliance has been deemed a condition of payment, "[n]or is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194.

The FCA's materiality standard is "rigorous" and "demanding[,]" and the statute is not meant to be an "all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 193–94. "[A] material misrepresentation is one that goes 'to the very essence of the bargain.'" *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 579 U.S. at 193 n.5)). Under the FCA, a misrepresentation is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citing 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003)).

"[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 194. Proof of materiality could include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 194–95. On the other hand, it is "very strong evidence" that a requirement is not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Id.* "[M]ateriality 'cannot be found where noncompliance is minor or insubstantial.'" *Petratos*, 855 F.3d at 489 (quoting *Escobar* 579 U.S. at 178). Moreover, a plaintiff must plead claims of materiality with "plausibility and particularity" under Rule 9(b). *Id.* at 195 n.6.

Relator's claims fail under the *Escobar* standard because they contain no substantive allegations to support a finding of materiality. The Amended Complaint does not allege that DOE would have ceased payment to Defendants under the Servicing Contracts if it learned about the Defendants' proportional allocation method during the CARES Act Forbearance Period. It vaguely discusses a suit brought by the CFPB against Navient "for making misrepresentations to borrowers and misallocating payments," (ECF No. 5, ¶ 110) but offers no additional facts or analysis as to Relator's claims in this case, and instead only links the complaint from that suit in a footnote. (ECF No. 5, ¶ 110 n.10). These vague assertions fall far short of the requirement that materiality be pled with particularity. *Escobar*, 579 U.S. at 195 n.6. Further, Relator alleging that compliance with the Presidential Memorandum, the CFPA, or various state statutes was a condition of payment under the Servicing Contracts is insufficient to demonstrate materiality. *Id.* at 194. While Relator alleges that the Servicing Contracts give DOE the option to decline to pay Defendants if it knew of Defendants' alleged wrongdoings, (ECF No. 5, ¶ 135), this is still insufficient for a finding of materiality. *Id.*

In her Response in Opposition, Relator also relies on the FSA Guidance to argue that the Government did not have knowledge of Defendants' proportional allocation method until her FCA suit was filed, and that the Government having gained knowledge of Defendants' alleged misconduct is evidence of materiality. (ECF No. 80 at 7). However, Relator confuses what the Government *knew* with what is *material* to the Government's decision to pay Defendants under the Servicing Contracts. "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," and "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

Case 1:20-cv-13590-CPO-SAK   Document 85   Filed 03/15/22   Page 24 of 28 PageID: 1363

Defendants highlight Relator's failure to plead facts showing that DOE halted payments to loan servicers based on any servicer's proportional allocation method (ECF No. 71 at 37), which Relator does not dispute, (ECF No. 80 at 6–8). Such failure "dooms [her] case." *Petratos*, 855 F.3d at 490. The Government is clearly aware of the Defendants' proportional allocation method by its issuance of the FSA Guidance, yet Relator fails to point to a single instance where the Government has refused to pay a federal student loan servicer for implementing a proportional payment allocation method. "Simply put, a misrepresentation is not material to the *Government's payment decision*," when the relator alleges the Government had knowledge yet provides no evidence that the Government stopped making payments or refused to make payments after gaining such knowledge. *Petratos*, 855 F.3d at 490 (emphasis in original; internal quotations omitted). Rather, this fact seems to establish conclusively the *lack* of materiality.

Relator next argues that the Government's having not moved to dismiss her Amended Complaint is evidence of materiality. (ECF No. 80 at 7–8). However, considering that the Government would have to intervene in the case to file a motion to dismiss, as the Third Circuit recently held in *Polansky v. Exec. Health Res. Inc*, 17 F.4th 376, 385 (3d Cir. 2021), Relator's assertion fails. Courts have often found where the Government declines to intervene in a *qui tam* FCA suit or take any action against a defendant after having notice of alleged misconduct to be evidence that the Government *does not* consider the alleged statutory, regulatory, or contractual violation to be "material" to the services that a defendant performs for the Government. *See Petratos*, 855 F.3d at 490; *United States ex rel. Cressman v. Solid Waste Servs., Inc.*, No. 13-05693, 2018 WL 1693349, at *6 (E.D. Pa. Apr. 6, 2018). Additionally, as Defendants highlight in their Reply (ECF No. 83 at 13), courts often dismiss *qui tam* complaints for lack of materiality,

despite the Government *not* having moved to dismiss the relator's complaint. *See Petratos*, 855 F.3d at 490–92; *Pioneer Educ.,* 2020 WL 4382275, at *4–5; *In re Plavix*, 332 F. Supp. 3d at 949.

In sum, Relator fails to plead materiality to the heightened standard as set forth in *Escobar*, and therefore, her FCA claim must be dismissed. *Pioneer Educ.*, 2020 WL 4382275, at *5 ("[F]ailure to plead materiality [is] a proper basis for a motion to dismiss." (internal quotations omitted)).

### C. Scienter

Even if Relator did plausibly allege that Defendants presented false claims to the Government and that those misrepresentations were material to the Government's payment decisions, the Amended Complaint fails to allege sufficient facts to allow the Court to "draw the reasonable inference" that Defendants knew that their claims were false or fraudulent. *Iqbal*, 556 U.S. at 678. The FCA imposes liability on a person who "knowingly" makes a false or fraudulent claim to the Government. 31 U.S.C. § 3729(a)(1)(A). The FCA defines "knowing" and "knowingly" to mean acting with actual knowledge, deliberate ignorance, or reckless disregard of information's truth or falsity. 31 U.S.C. § 3729(b)(1)(A). Specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B). *Escobar* emphasizes that, like the FCA's materiality requirement, the scienter requirement is "rigorous." 579 U.S. at 182. "'Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations.'" *United States v. Allergan, Inc.*, 746 F. App'x 101, 105–06 (3d Cir. 2018) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015) (recognizing defense of reasonable, but erroneous, interpretation of ambiguous statute)).

The Amended Complaint states that the Defendants "knowingly violated the Presidential Memorandum, the CFPA . . . [and] state laws" and then "knowingly failed to disclose these violations" to the Government when servicing student loans. (ECF No. 5, ¶ 131). These are the only allegations to support Relator's legal conclusion that "Defendants therefore knowingly presented, or caused to be presented, false or fraudulent claims," (ECF No. 5 ¶ 132), and "acted with the requisite scienter" (ECF No. 5, ¶ 133). However, conclusory allegations are insufficient to plead knowledge under the FCA. *United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760–61 (3d Cir. 2011). The Amended Complaint is otherwise devoid of facts supporting an inference that Defendants "knew, acted in reckless disregard, or deliberately ignored that [their] submissions were false." *Id.*

In Relator's Response in Opposition, she cites several CFPB reports, which Defendants rely on in their Joint Motion to Dismiss, to argue that because the CFPB has cited some student loan servicers in the past for misconduct and that servicers may have "mismatched incentives" when allocating prepayments, that these reports "surely support[] the allegation of the requisite scienter." (ECF No. 80 at 10–12). These arguments are unavailing. Even if Relator plausibly alleges that Defendants submitted false claims to the Government—which she does not—no information from the CFPB reports was alleged in the Amended Complaint to cure Relator's pleading deficiencies to lead to the "reasonable inference" that Defendants knowingly submitted false or fraudulent claims.[15] *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are

---

[15] Defendants further argue that their interpretation of legal requirements were objectively reasonable since it was DOE's own understanding of the law that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan." (ECF No. 71 at 40–42 (quoting FSA GUIDANCE at 1)). However, the Court does not reach this argument where it does not find Defendants' interpretation of federal law or DOE's regulations erroneous.

'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 545–46)).

Even if Relator plausibly alleged that Defendants knowingly submitted false or fraudulent claims, she must further plausibly allege that the Defendants *knew* compliance was material to the Government's payment decision, which the Amended Complaint again fails to do. *Escobar*, 570 U.S. at 181. Relator's conclusory allegation that "Defendants acted with the requisite scienter and [sic] compliance . . . was a precondition of payment," (ECF No. 5, ¶ 134), is insufficient. *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Further, "even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability. "What matters is not the label the Government attaches to a requirement, but whether the defendant *knowingly* violated a requirement that the defendant *knows is material* to the Government's payment decision." *Escobar*, 579 U.S. at 181 (emphasis added).

Relator fails to plausibly allege that Defendants knew they were submitting false claims to the Government, or that Defendants knew compliance was material to the Government's payment decisions. The Amended Complaint thus must be dismissed.

*****

Relator has failed to plausibly allege that Defendants (a) were noncompliant with any federal or state statute or regulation violation rendering any claims submitted as false, (b) that Defendants submitted false claims that were material to the Government's payment decisions, or (c) that Defendants knowingly submitted false claims or knew noncompliance was material to the

Government's payment decisions.[16] Because the Court finds that Relator has failed to state an FCA claim on each of these grounds, it need not address Defendants' remaining arguments regarding the applicability of the public disclosure bar or whether the HEA preempts any state laws.[17]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72, ECF No. 73) is **GRANTED** and Relator's Amended Complaint (ECF No. 5) is **DISMISSED**. The Court will permit Hlywiak an opportunity to file a Motion for Leave to Amend within thirty (30) days, in which she explains how the deficiencies outlined herein may be cured through amendment.[18] An appropriate Order follows.

 */s/ Christine P. O'Hearn*
**CHRISTINE P. O'HEARN**
**United States District Judge**

---

[16]   Defendants separately argue that Relator's allegations are not sufficiently particularized under the heightened pleading standard imposed on fraud claims by Federal Rule of Civil Procedure 9(b). *See Foglia*, 754 F.3d at 155–56 (acknowledging that the Rule 9(b) standard applies to FCA claims). The Court declines to address this argument because regardless of their relative *particularity*, the *plausibility* of Plaintiff's allegations regarding falsity, materiality, and scienter— or rather, the lack thereof—dooms her claim under Rule 12(b)(6).

[17]   The Court also does not reach Nelnet's argument that Nelnet, Inc. and Nelnet Diversified Solutions, LLC do not service any federal student loans at issue or present claims for payment to the Government (ECF No. 71-1 at 49 n.17), as this presents a fact issue that cannot be resolved on a motion to dismiss under Rule 12(b)(6). However, the Court does not find this issue of disputed fact relevant to the outcome of this Motion where Relator's Amended Complaint fails to state an FCA violation under Rule 12(b)(6).

[18]   Any motion by Relator for leave to file a second amended complaint must attach a copy of the proposed amendment as well as a redline reflecting proposed changes. L. Civ. R. 15.1(a).